No. 65.—ROBERT COLLINS, plaintiff in error, *vs.* The CENTRAL BANK OF GEORGIA *et al.*, defendants in error.

The 11th section of the charter of the Monroe Railroad and Banking Company, gives to bill-holders a paramount lien, for the payment of their bills, upon that part of the road only which was built by the company.

Such portion of the road as was built by the contractors, under a mortgage thereon, to secure them for the work done, and materials and equipments furnished, is liable to them, and their lien is paramount to that of bills or notes; the lien of the latter only attaching upon such portion of the road as was built by the company.

The setting apart of bank bills, as a pledge or security, by the said banking company, was not an issuing of such bills as a circulating currency, within the meaning and intention of the charter.

A bill was filed on the chancery side of the Superior Court of the county of Bibb, at the instance of the Monroe Railroad and Banking Company against the Roswell Manufacturing Company and others, the creditors of the former, the object of which was to obtain a decree for the sale of the railroad and equipments, and all the rights, franchises and property therewith connected, and for a distribution of the proceeds among the creditors, in order of priority of their claims, the said railroad company having become hopelessly in-

solvent, and unable to complete the road, or keep the same in operation, or pay their debts. At May Term, 1845, of said Superior Court, a final decree was rendered in said cause, ordering the sale, and appoint- . ing certain commissioners to carry the same into effect, and providing that the proceeds of said sale should be paid to the clerk of said court, and by him deposited in bank, for safe keeping, on special deposit, and that public notice should be given to the creditors of said company to file their respective claims, or a schedule thereof, in the clerk's office of said court. That the creditors, if any controversy should arise respecting said claims, should then litigate amongst themselves, in respect to all objections which would or might have been available against them by the company, if said sale had not been made, in relation to matters of set-off, and whether they should be subject to objection on account of the statute of limitations, non-performance of contracts, or other causes, *embracing the quantum of consideration paid for claims, or any of them;* and also, that the liens claimed by the respective creditors should be then and there also investigated and adjudicated.

The sale took place, and the sum of $160,525 33 brought into court. At May Term, 1846, of said Superior Court, the question of the distribution of said fund amongst the claimants who were creditors of said company came on to be heard, before Judge Floyd, when it was moved, on the part of the defendant in error, and other bill-holders of said company, that the court should order and decree that said fund should first be applied and paid out in satisfaction of said bills, as having priority over all other claims, by virtue of a statutory lien created under the 11th section of the charter of said company, as follows: " *The railroad to be built by said company, from Macon to Forsyth, together with all revenue arising therefrom, and all the property, equipments and effects therewith connected, shall be pledged and bound for the redemption of the notes, or bills, issued by or from said company;*" which motion was opposed by the counsel of the plaintiff in error, as mortgagee, who contended, and maintained, before the court below, that the statute relied on by the counsel for the bill-holders did not create a legal specific lien, paramount to all other liens on said road. And they contended for, and moved the court to rule that, as the plaintiff in error was, *bona fde,* the holder of bonds, certificates, or notes, secured by mortgage on said road, and its appurtenances, to secure the payment for work, labor and materials, done and furnished on said road, subsequent to the execution of said mortgage, and on the faith of said mortgage, the plaintiff in error was entitled to be paid out of said fund, in preference to bill-holders. In behalf of the plaintiff in error, it was then shown to the court, that in 1842 the said company became entirely unable to proceed with their work, and which was then in a very unfinished and ruinous condition, even below the city of Griffin. In this situation, on the second day of August, 1842, the company entered into a contract with the plaintiff in error, and others, his associates, for certain work, and materials, as agreed upon in said contract, the company agreeing to secure the payment for said work and materials, by a lien, or mortgage, on the road and property of the company. Under this contract, a large amount of work was done, and materials furnished, on said road. Amongst other things, about 1,200 tons of railroad iron, with cars, car-wheels, engines,

tenders, tools, &c., to the amount, by engineer's estimate, of $154,146 86; besides which, said contractors furnished timber, and built about thirty-six miles of superstructure, and several miles of grading, leaving only four miles to be done to complete their contract, which would have been done but for hindrance by the company.

The mortgage clause of the agreement of the second of August, 1842, was in the following words, viz.: "It is further agreed by the parties hereto," (the Monroe Railroad and Banking Company, on the one part, and John D. Gray & Co., D. McDougald, A. B. Davis, Robert Collins, and Elam Alexander, of the second part,) "that the whole of the Monroe Railroad, to the point of junction with the Western and Atlantic Railroad, and all and every part thereof, implements of every kind therewith connected, or to be connected, and all real estate to the same appertaining, and all other effects to the same appertaining, shall be and is hereby conveyed and vested in the said parties of the second part, (the plaintiff in error, and associates,) in full title and estate, until all the dues and payments to which they shall become entitled under this contract shall have been fully met and satisfied. *Provided*, however, that the management, superintendence, and keeping up of said road, and the use of the property, &c., herein named and conveyed, and of all transportation thereon, shall continue to be conducted by the said Monroe Railroad and Banking Company, their officers and agents."

It appeared that the plaintiff in error, and his associates, performed their part of the contract, except the completion of four miles of the road, which they were prevented from doing by the company.

After argument in the court below, the presiding judge ruled, and decided, that the lien created by the bills of said company, under the said 11th section of the charter, was paramount to, and overrode all liens, and that said motion of the bill-holders should be granted; and overruled the motion of the plaintiff in error, and adjudged and determined that the said fund should be paid out, in the following order:

Costs legally incurred in obtaining the decree, and making the sale under it.

Attorneys' fees, for bringing the money into court.

The taxes of the company due the State of Georgia.

Then bank bills, each bill to take in proportion to the value received by the bank for it, at its emission by the bank. Judgments founded on bank bills, to take *pari passu* with bank bills, and under the same terms.

Next in order, judgments founded on contracts, other than bank bills and mortgages, according to the respective dates of each ; judgments for right of way included as judgments. All other claims, not reduced to judgments, nor secured by special lien, placed on the same footing ; and appointed certain auditors to hear and audit the claims submitted, and to make report thereof, &c.

Whereupon the counsel for the plaintiff in error, as mortgagee under the contract aforesaid, excepted upon the following grounds :

1st. Because the court below ruled and decided that the clause in the charter of said Monroe Railroad and Banking Company, declaring that said road should be " pledged and bound for the redemption of the bills or notes of said company," created a specific and paramount legal lien, on said road, over all other liens.

2d. Because the court below decided, that the directors of said com-

pany could not make a mortgage or transfer of said property, (road and fixtures,) so as to exclude the statutory lien of bill-holders.

3d. Because the court below decided, that the bills of said company had a specific lien on the whole money arising from the sale of said road, when the statute creating said pretended lien in favor of bill-holders, only extended to a part of said road, to wit: that part of said road extending from Macon to Forsyth.

4th. Because the court below decided, that the work and labor done on said road, and materials and iron furnished and put on said road by the contractors to whom said mortgage was given—which said work was done, and materials furnished after the insolvency of said railroad and banking company—was liable and subject to the payment of the bills of the company, in preference to said mortgage or debt for said work and materials.

5th. Because the court below decided, that the bank-bills should each take in proportion to the value received by the bank for it, at its emission by the bank, whereas the original decree fixed the *quantum* of consideration, paid for the bills by the claimants, as the amount to be received.

Afterwards, in an adjourned term of the court below, the plaintiff in error showed, that at the same time the mortgage contract aforesaid was made by said company with himself and his co-contractors, it was also agreed that the sum of $300,000, of the bills of said banking company, should be set apart and placed in the hands of a third party, to be held as further security to said contractors, and to be delivered to them in the event that it should be decided by the judicial power of the State, that the bills of said bank had any preference or priority over other claims, by virtue of the said 11th section of the charter of said company; and in accordance with said agreement, said bank-bills, to the extent of about $200,000 were set apart and held for that purpose.

So the matter stood until the term aforesaid of the court below, when the presiding judge ruled as aforesaid, that bills of said bank had preference and priority over the mortgage claim against said company. Whereupon the said plaintiff in error caused the very same bank-bills which had been so set apart as aforesaid for that purpose, to be brought forward and delivered to the auditors, and required that the amount of his said claim should be audited from the bills, according to said contract with the company; but the auditors declined to do so, and the court below decided, that said bills could not be considered as bills issued by the said company, and therefore they could not be admitted to receive, from the fund, any *pro rata* or other share with other bank-bills. That, as to said claim of the plaintiff in error, to be allowed to claim, and take out of said fund as a bill-holder, by virtue of the bills set apart by said bank, as a collateral security, to secure said plaintiff in error, and others for work done and materials furnished on said road, the same was invalid, by reason that said bills, in the opinion of the court below, had never been legally issued by said bank. To which decision and judgment of the court below, the plaintiff in error excepted.

Because the court below erred in deciding, that the said bills, set apart as collateral security, to secure the plaintiff in error and his co-contractors for the work and labor done, and materials found and furnished, on said road, had not been legally issued by said bank, and therefore could not claim any of said fund.

S. T. BAILEY, for the plaintiff in error.

The subject of controversy that gave rise to this writ of error, is the distribution of a fund arising from the sale of the Monroe Railroad and its effects, by virtue of a decree in equity, at the suit of the Monroe Railroad and Banking Company, against the Roswell Manufacturing Company and others ; which latter company, seeking to subject said road to levy and sale at law, by virtue of *fieri facias*, was enjoined by said suit upon grounds set forth in the bill, and which bill finally took such shape as to pray for and obtain a decree for said sale.

After the money was brought into court, the claimants for said fund, as creditors of the Monroe Railroad and Banking Company, brought before the court their claims ; among such claimants was the present plaintiff in error, claiming to have created nearly the whole of said road, by his labor and materials, found and furnished, and the sale of which produced the greater part of the fund in controversy; and having been turned away empty, he has appealed to this tribunal, feeling assured that he can maintain successfully, in all Christian lands, " that the laborer is worthy of his hire."

To come to a correct conclusion upon the questions raised by the bill of exceptions, it will be necessary, in the outset, to understand clearly the powers and character of the Monroe Railroad and Banking Company, the title by which they held property, and the character of the fund produced by the sale of their road.

By the act of 1833, a company, by the name of " The Monroe Railroad," were chartered to construct a road from Macon to Forsyth ; were empowered to purchase, accept, hold and sell, and convey real and personal estate, and make all contracts usual with corporations, &c. All the officers authorized by this act, are a president and eight directors. They were empowered to " purchase the right of way" for their road; they were authorized to farm out or rent to any individual the use or franchise of their road. The shares of their stock are made assignable. These provisions are important to be kept in view.

In 1836 an act was passed, called an act to amend, enlarge, extend and alter, and add to the act of 1833. But, instead of amending, the act creates an entirely new company, called " The Monroe Railroad and Banking Company," which, by said corporate name, shall be capable in law of contracting and being contracted with, of suing and being sued, &c. The old company is expressly amalgamated and incorporated into this new company, as a constituent part thereof—its rights and liabilities are expressly transferred to the new company : all this is, both in law and logic, a new creation, not the amendment of an old. What lawyer ever imagined it necessary to reconfer the right to sue and be sued, &c., on a corporation at each amendment of its charter, or that there must be a solemn assignment of the rights, liabilities and property of the corporate body in its old dress, to the same body in its amended dress ? But all know that this is necessary where a new corporation supersedes the old. This new charter creates a stock of $600,000, and directs one half to be appropriated to the road, and the other half to constitute the capital stock for banking purposes.

For this new company there are to be a president and six directors,

and for the "banking department" (so the act calls it) there are to be a cashier and other officers. And it is reiterated, that one half the capital paid in shall be faithfully set apart and applied to the building the road. The eleventh section of the act on which the court below predicated its decision, is in these words : "The railroad to be built by said company, from Macon to Forsyth, together with all the revenue arising therefrom, and all the property, equipments and effects therewith connected, shall be pledged and bound for the redemption of the notes or bills, issued by or from said company ; and for the redemption of the same, the private property and individual persons of the stockholder shall likewise be pledged and bound in proportion to the number of shares held by each, in the same manner as in commercial cases or actions of debt."

The act further provides, that the company may increase their stock, so as to extend the road to the State road in De Kalb, and also that the State may subscribe for one-fourth part of the stock in the extension. The 22d section declares that "the several laws forming the charter of the Monroe Railroad and Banking Company shall be in force and applicable to the road extended beyond Forsyth, in respect to banking privileges, and in all other respects, in the same manner as they are in force and applicable as to the road from Forsyth to Macon." It will be remarked that, in this new charter, nothing is said about the company's accepting, holding, buying and selling, real and personal property, as in the old charter, nor about renting and farming out the road. By the 23d section it is declared that the old charter shall be and continue in force in respect to the new charter, so far as it does not conflict therewith. It is by this latter section that the new company have the power to hold, buy and sell property and farm out their road.

We maintain that the company created by the act of 1836, called the Monroe Railroad and Banking Company, is a company composed of two distinct corporations, one for railroad purposes, the other for banking—not only are their duties kept distinct in the act, but the officers, as a body, are distinct ; and the act expressly provides that the stock of each shall be kept distinct and separate. Such double corporations are well known and recognized in law.—*Angell and Ames on Corp,* 52, 57 ; 1 *Pickering's Reports* 297, 305 ; 6 *ib.* 427 ; 1 *Sumner R.* 47 ; 14 *Mass.* 58.

In this view of the case, we clearly perceive the meaning and the reason of that somewhat singular expression in the 11th section of the new charter, that the railroad, with all its revenue, and all its property, shall be pledged and bound for the redemption of the notes or bills of the company.

Without that provision, the road would not have been liable for the debts of the bank, as a joint fund. The act itself had expressly made it a separate fund, so that without this exception in favor of notes and bills, the debts and liabilities of the road proper would have been entitled to preference, and would have to be paid before the debts of the bank could touch a dollar. This is the law governing the distribution of joint funds and separate funds—it is the law of copartnerships ; and we shall show that this company was essentially and purely a copartnership —it is a delusion to call it a corporation. Corporations are becoming

obsolete in this country—the name is retained without the substance—courts look beyond the name to the substance.

But now the holders of the bills of the bank attempt to so construe this provision of the charter, (intended only as a favor to place them on an equal footing with the debts of the road,) as to give them a prior right to take the whole fund instead of a part. But let us see into what absurdity it will lead to construe this expression, "shall be pledged and bound," to create a lien in favor of bill-holders. Let it be kept in view that the act does not declare that notes or bills shall have priority, or take precedence over other debts, as is the case in statutes, giving the crown, in England, and the government here, a priority of payment.

The bill-holders, and the court below, were, therefore, driven to construe the words quoted from the charter, as giving a specific, prior and legal lien, overriding all other claims, contracts, or transfers, and of course, over mortgages.

Now, does not every lawyer at once perceive two insurmountable difficulties in this construction?

First, that it runs counter to the charter, which declares, the company may buy and sell real and personal estate. If this lien attaches, they could not make a clear title.

Secondly, such a construction is suicidal; for the road could neither be built, nor sustained after being built. Who would build a road from which he could not even hope to derive any profit—or who would "rent or farm out" such a road? For it is to be remarked that the "revenue," as well as all the property, is "pledged and bound," so that it must be carefully kept, like the capital stock of a bank, untouched; or if it is used, (either revenue or property,) it can be followed into whosesoever hands it may pass, and they cannot plead that they took without notice, for all are bound to notice a public law; in short, the road and its revenue must be looked upon as bank capital; that is, in plain words, the construction and doctrine of the bill-holders, notwithstanding the charter has carefully declared, that even the stock of the two institutions shall be kept distinct.

But again: if a lien, it is a mortgage; and if a mortgage, then, when does it attach? at the date or the issue of the bill? In whose favor does it attach? in his who first took the bill, or in his last in possession? If the bank takes up the bill, does the lien cease until a reissue, and then does it again attach? and from what time, the date or the reissue? and if the latter, how are you to prove the time of the reissue?

Again: if a lien, it should have been a matter of record. Our statute requires mortgages to be recorded, and the general doctrine of lien, by all laws of civilized countries, is, that notice must be brought home to third persons, to affect them. It is no reply to say that the statute gave notice. Being a public law, the statute, *argumenti gratia,* says, that there may be a lien, provided there are any bills or notes of the bank to redeem; this is all the notice it gives. The material notice required is the note or bill when issued, its amount, date, &c.; for that the statute provides no record nor notice.

Again: if these bills are mortgages, they are void for not being recorded. And how are they to be foreclosed? If not mortgages, what are they? Are they such liens, that, like judgments, they can be levied

on the property pledged, without a verdict or judgment upon them? So they seem to be treated by the court below, when it adjudges that it will make no inquiry as to the genuineness or *bona fides* of the bills presented. But I trust this court will deem them only promissory notes.

In *Cashberd et al.* vs. *Atty. Gen.*, (6 *Price R.* 411 ; 2 *Eng. Exch. R. Cond.* 523,) it was ruled that even a crown debt would not take precedence of an equitable mortgage, unless it was matter of record in some way. Mr. Powell says that liens and charges, even 'on equitable property, should be registered.—2 *Powell on Mort.* 622 ; 1 *Eden R.* 327. As, between the parties, a mortgage is binding without being recorded, and all others having notice, yet it is well settled that a mortgage intended to secure other debts not mentioned in the mortgage, cannot take precedence against other liens or purchasers, without notice of such debts, although the mortgage is duly recorded. If these bills are mortgages, where is the notice to the world, so as to guard against purchasing any of the property of the road, or any of its revenue ? It is not enough to know that bills are in circulation—they may be spurious, or they may be taken up by the bank.

Again :, we may admit, for sake of argument, the bills to have a mortgage lien upon the road between Macon and Forsyth, or that part built by the company before the new charter. What lien can they have upon that part of the road *above* Forsyth ? . This was not built at the time of the new charter—most of it never vested in the company : the legal title, by our mortgage, made and recorded before the road was built, vested in us so soon as made, to be divested when paid for. The franchise was all that the company ever had, and *that*, by the charter, they are expressly empowered to farm out. No one will contend that there could be any legal lien upon a franchise—that being but an emanation of sovereignty, it cannot become an article of trade, commerce, transfer or sale, only as the grant authorizes.

When it leaves the depository appointed by the sovereign power, it must return back to the sovereign who gave it. Like the soul of man, when it ceases to animate the body of its first earthly home, it cannot migrate to another, but must return whence it came. Suppose a case of daily occurrence : an insolvent individual, against whom there are judgments, desires a piece of land, for which he has made a verbal contract. He says to his neighbor, in writing, pay for that land, and use it until I repay the money, and then it shall be mine—would the judgment liens attach ? Or, suppose the insolvent has the grant of right to make a bridge across a river : he employs a builder, and conveys to him the right to hold the bridge when built until paid for—could the judgments attach ? Clearly not, for two reasons ; first, because the bridge, as distinguished from the franchise, is in the builder—the materials never belonged to the grantee of the franchise, neither did the labor bestowed.

Secondly, if it were in the insolvent, it is so connected with the franchise that no legal lien could attach to it—it could only be reached in equity ; and yet a judgment is as much a statutory lien as the bills of the bank in this case, even admitting, as contended on the other side, that they are liens at all. It has been adjudicated that a turnpike road is not subject to levy and sale.—*Angell* and *Ames*, 460, 461 ; 13 *Sergt.* and *Rawle*, 210 ; 17 *Mass. R.* 243. It has been held in all the courts, so far as my knowledge extends, except in North Carolina, that a rail-

road is not subject to levy and sale. . In the Supreme Court of North Carolina, it was held that they were subject to levy and sale—not the franchise, but the land over which the road ran. With the highest respect for that court, I must think they give no very good reason for their decision. It is true, as they say, the workmen who made the road ought to be paid ; yet is that a reason that the rules of law should be violated ? If the workmen neglected to secure themselves by mortgage, I humbly conceive their remedy was in equity.

Certain it is, that there is no title to the land over which the road runs, in the company, disconnected with the franchise. The moment it is sold from the corporation, it reverts to the grantor ; the company had nothing but the " right of way." So that the plaintiff in execution, or rather the purchaser under the sheriff's sale, gains nothing by the sale, only the gratification, if it is one, of depriving the corporation of the right of way, and restoring the land to the original owner.

But the most insurmountable objection to such sale is, that, by universal consent of all courts, English and American, and even in North Carolina, these railroads are public highways ; and if so, the North Carolina decision cannot be supported upon any principle of law or usage. If, then, this road was not subject to levy and sale at law, it was equitable property, to be reached only in equity. Such property is subject to mortgage, and no doubt the Legislature might have created a mortgage lien upon it, by declaring that the bills of the bank should be a prior lien upon the road and its revenues, to commence from their dates respectively, or from the time of registration, or from the commencement of a suit ; but it is absurd to suppose that any Legislature could intend to give a lien, that should not only attach without any record or notice, but should act retroactively, so as to cover the whole property, and its revenue, *ab initio*, divesting all prior liens, and annulling all transfers and conveyances : such a construction, as we have before remarked, would be in effect to annul the charter.

Then, if this was equitable property, that could be reached by the creditors only in equity, and if, as we contend, the Legislature intended only to subject it to the payment of the " bills or notes" of the bank, equally with the debts of the road, in case of insolvency as a joint fund, then the next inquiry is, when does the lien of the bills commence, so as to prevent assignments of the property, and take precedence of younger liens ? It is well settled that no general lien in favor of creditors attaches upon equitable property until the filing of a bill.—1 *Paige's R.* 637 ; 9 *Cowen's R.* 722 ; 3 *Atk. R.* 357 ; 5 *J. Ch. R.* 280 ; 1 *Paige's R.* 305. It is not within the statutes of Elizabeth against fraudulent transfers.—*Story's Eq.* 366, 367 ; 1 *Vesey, Jr.* 196 ; 9 *ib.* 188, 189 ; 10 *ib.* 368 ; 18 *ib.* 196.

Then, if this equitable property is not subject to levy and sale, the only course for the bill-holders to render it subject to their debts, was to obtain judgment on their bills at law, and then commence suit in equity.

The bill-holders lay by, and saw the plaintiff in error expend his labor and money in making the road ; they sanctioned the proceeding ; they cannot take advantage of their own *laches*; they never commenced suit.—1 *Paige R.* 638, 305 ; 4 *J. Ch. R.* 687.

Such would have been their course against the road ; their remedy is

varied, now that they apply for the fund arising from the sale of the
road, and this we shall discuss hereafter.  But here it is proper to re-
mark, that the bills of this institution are to be treated like the bills of
other banks; the act giving the charter does not change their character;
they are promissory notes, entitled at law to no lien until reduced to
judgment.—3 *Wend. R.* 21.

Before closing this branch of the subject, it is well to examine criti-
cally that section of the charter on which the bill-holders rely, as *giv-
ing* them a lien.  The expression, "pledged and bound," cannot bear a
legal definition : a pledge requires possession in the pawnee.  Again : it
is not a legal term when applied to real estate; the expression is used
not in a strictly legal, but in a vulgar sense; it is the universal under-
standing in the common affairs of life, that to be " pledged or bound"
only means that there is an obligation or liability; we often speak of a
man's pledging his word; the understanding is, only, that he has given
assurance that another may trust in his truth.  We speak of one being
bound as security for another; we understand, not that he is to pay that
security debt in preference to all others, but that he is to pay on fail-
ure of his principal to pay.  We speak of a man's property being bound
to pay his debts; we never intend thereby, that his creditors have a
lien on his property, but only that the legal title is in him, and not in
his wife or others, and that his creditors can subject it to the payment
of their debts, if they choose.  In all these cases, a trust and confidence
and obligation is understood.  In this sense the Legislature intended to
be understood; they intended to say, and we contend it is all they have
said, on failure of the bank to redeem its bills, the bill-holders may resort
to the road, however hard it may seem to the creditors of the road that
they should have to divide their half with the creditors of the bank, after the
latter have exhausted the whole of the half assigned to the bank; yet,
for the safety of the community, they thought fit to impose this hard-
ship on the creditors of the road.  Who but bill-holders ever dreamed
that this hardship was to be enlarged to a kind of robbery, by taking,
not a part, but the whole—leaving nothing for the creditors of the
road ?  Our construction is much strengthened by the fact, that the same
expression, "pledged and bound," is applied to the persons and prop-
erty of the individual stockholders.  The Legislature intended to ren-
der liable the road, and the private property of the stockholders, neither
of which would have been liable as a joint fund to pay the bills, without
an express enactment to that effect.

But, finally, as the ultimate absurd result of the doctrine contended
for by the opposite counsel, it is clear, not only that all the property
(and that a considerable amount) which has ever been transferred by
the corporation, is still subject and liable to their liens, but the road
itself, with its revenues, is still liable to their lien; for the sale was not at
their instance, nor were they parties to the proceedings; but the sale
was by, and at the instance of, the Monroe Railroad and Banking
Company.

If their lien is a mortgage, taking precedence of all other liens, then
the law is clear, that neither the company, nor any judicial tribunal,
nor any officer of theirs, can, without their consent, divest that lien by
any process or sale known to the law.  So that, if the decision of the
court below is to be sustained here, we are by no means the only suffer-

ers : purchasers who had just as much notice of this lien as we had, may be called upon to redeem these bills. It will not avail them to say, that they have built a new road ; they will be told such a plea did not avail this plaintiff in error ; neither will it avail them to say, that both the decree of the court and statute amending their charter, relieve them from the debts and liabilities of the old company ; they will be told that no act of the Legislature can impair the obligation of contracts, and that no court can divest vested rights of parties not before them.

We, in the next place, maintain, upon authority, that this company was essentially and purely a copartnership. The court is familiar with the distinction between a copartnership and a corporation. All the authorities agree, that when the individual property of the members is by law made liable to the company debts, it is a mere copartnership.— *Angell & Ames*, 364, 493, 497 ; 17 *Mass. R.* 334 ; 1 *Mason R.* 243.

And Judge Story, and other judges, have decided that when they are declared to be liable, as in commercial cases, the members may be sued separately. This company thus being a copartnership, joint debts in equity have a priority of payment out of the joint funds and separate debts of the separate funds. Mr. Story, quoting the rule of the civil law as governing in such cases, says : When a person carries on two trades in different houses, the creditors who have given credit to one of those trades or houses, have a privilege upon the effects there found, to the exclusion of the creditors who have given credit to the other trade or house, and the latter have a like exclusive privilege upon the funds to which they have given credit.— *Story on Part.* 519, 520 ; *Gow*, 408, 409. Hence the additional necessity of the enactment in the charter of the Monroe Railroad and Banking Company, pledging the funds and effects of the road to the redemption of the bills of the banking department; thereby putting them on an equality in case of insolvency. Without such enactment, the creditors of the bank could not touch a dollar belonging to the road, till all who had given credit to the road were satisfied in full. This far, we have established that the property out of which this fund was raised was equitable property, that could not be reached by the bill-holders only in equity ; and that the Monroe Railroad and Banking Company was a copartnership, and the fund was raised from the sale of joint or partnership property ; and we have endeavored to show that the plaintiff in error would stand on an equality with the bill-holders, *even if he were a creditor* of the road on simple contract, by the provision of the charter upon which the bill-holders rely for the priority, as well as by the well-settled rules of equity, which distributes insolvent estates ratably *pari passu.*—1 *Story Eq.* 554 ; 1 *J. Ch.* 119 ; 5 *Peters' R.* 160 ; 11 *Eng. Ch. R. c.* 320, 322 ; 2 *Smith*, 275 ; 1 *J. Ch. R.* 130.

We propose now to show, that we stand on much higher ground than simple contract creditors, and that we have a prior right, first as mortgagees, and second, as having an equitable lien, for materials and labor conferred on the road. A mortgage gives the legal title, and is more than a lien.— *Cross on Liens*, 62, 72.

In bankruptcy, a lien by judgment is not saved.— *Eden*, 222, 285. A mortgage is protected.— *Eden*, 225, 290.

Although courts of equity distribute insolvent estates ratably *pari passu,* amongst all the creditors, yet it does not divest the property of mortgages.—1 *J. Ch. R.* 129. We, by our mortgage, under the laws of Georgia, had a common-law remedy; the bill-holders had no remedy, save in a court of equity; and when they come here for a fund, they must take ratably with all other creditors.—1 *J. Ch. R.* 130.

We will next show that we have not only a specific legal lien by mortgage, but that we have also a better equitable lien than the bill-holders; and, if we have both a legal and equitable title, we must prevail over a bare equitable title or lien.—2 *Powell on Mort.* 451, 452; 2 *J. Ch. R.* 608.

It is a well-settled principle in equity, says Mr. Justice Story, that in all cases where one has, *bona fide,* bestowed labor and materials on the property of another with his assent, by which an additional value is conferred on the property, it creates a prior lien upon the property until such improvements are paid for.—1 *Story Eq.* 478, 494; 2 *ib.* sec. 1234; *ib.* 799, *note*; 4 *Meeson & Welsby R.* 272; 5 *ib.* 342.

Again: when equity is called on to assist a creditor, it will insist that all creditors may stand on an equality.—1 *Story,* sec. 557; 1 *J. Ch. R.* 130.

Again: conceding, *argumenti gratia,* that the bill-holders would stand on an equality with us, provided there were no other fund to resort to, yet since they have two, and we have but one resort, equity *requires* that they should resort to that on which we have no lien; *it is* very clear that the bill-holders may resort to the road and to the individual stockholders for payment. No other creditors have that privilege; none but bills are secured by resort to stockholders; then equity says to the bill-holders: You shall let go the road, the only fund to which the plaintiff in error can resort, and take your pay out of the other fund, to which you can resort.—1 *Story Eq.* sec. 559; see *Atk.* 446; 17 *Ves.* 514, 520; 8 *ib.* 388, 395; 9 *ib.* 210, 211; 3 *ib.* 64; 4 *J. Ch.* 17; 1 *ib.* 412; 1 *Russ.* and *Mylne,* 185; 3 *Sim. R.* 280.

Before concluding, it is proper to remark upon this bill and decree, which brought this fund into court, that it will be perceived that the bill was originally filed expressly and avowedly, by the Monroe Railroad and Banking Company, to secure the plaintiff in error in the fulfillment and payment of his contract, for the satisfaction of which he applied to the court below for a share of this fund now in controversy.

That bill, for reasons not proper to state here, was so changed by the plaintiff in the cause, as to pray for a sale of the road, and that the fund might be distributed among all their creditors; it was originally filed to prevent a sale. It is obvious, therefore, that the complainants in the bill acted, as far as they were able, and as far as they knew how, in good faith toward the plaintiff in error. Their object (a just and righteous object) was to give the laborer his hire. Will any one do them the injustice—will any one so pervert the reading of the record, as to say, that the object of the complainants in that bill, was to sell the road, and give the money to the bill-holders, and exclude the plaintiff in error from even a participation in the fund? Although, by so doing, they would relieve the stockholders of a heavy liability, we believe they

acted in good faith, and that it does them gross injustice to suppose that they were using the judiciary as an instrument to perpetrate a most iniquitous fraud. Indeed, the decree speaks for itself.

It states that the road is subject to the payment of all the debts of the company, not the bill-holders alone, and it virtually orders that the fund arising from the sale shall be distributed amongst all the creditors, according to equity, after they should have established their respective claims.

It is proper that we should endeavor to relieve this court from a difficulty that found lodgment in the mind of the court below. It was this : The court remarked, in giving his final opinion, that he never had any doubt, that in justice and equity, the plaintiff in error ought to be paid in preference to all other creditors, and that it ought to have been so declared in the decree ordering a sale of the road, and that he should certainly have had the decree so drawn, but that it was now too late.

We were certainly not a little surprised at this difficulty in the mind of the court; but it was then too late to even attempt to remove it. We hope this court will perceive no such difficulty. It seems clear to us, that as that bill was filed, not by the plaintiff in error, but by the Monroe Railroad and Banking Company, the debtor praying for a judicial assignment of their property for the benefit of all their creditors, it would have been wholly against the practice and usage in equity, to decree the payment or priority of any particular creditor ; that is always a matter to be settled on creditors coming in under a decree.

In relation to the bills set apart by the company as an indemnity, the question arose on the report of the auditors appointed to report to the court at its adjourned term, in July.

That report rejected the claim of the plaintiff in error to come in as a bill-holder, claiming to hold bills as an indemnity for the work and labor and materials, found on said road to be used, provided the court should adjudge that the bills were entitled to a priority over his mortgage on the road.

Several exceptions were filed to said report, or rather to the decision of the court below, on that report's coming in. But for the purpose of trying both cases together—the one on the decision at the term in May, and the other at the adjourned term in July—the plaintiff in error consented to waive all his exceptions in the latter case, except the one on the decision of the court respecting the collateral security on the bills.

That bank bills, although used as money, are promissory notes, in the contemplation of law, none can question. They are as legitimate subjects of pledge as any other chose in action, or any chattel; this cannot be denied.—3 *Wend. R.* 21 ; 9 *Paige R.* 12.

Then, did the Monroe Railroad and Banking Company pledge to the plaintiff in error and others, bills to secure or indemnify them for work, labor and materials furnished on the road ? The evidence is, that there was a written contract under seal, between the parties, that some third person should take charge of three hundred thousand dollars of their bills, to *hold* as an indemnity, to be delivered to the parties, to be secured, in case the court should hold that bill-holders have a prior right over their mortgage. It is in proof that this package of three hundred thousand dollars was delivered to Dr. Wynne, as the depository selected

by the parties ; that Dr. Wynne took a schedule of the bills, and left the package in the bank on deposit ; that afterwards, the bank officers, without the privity or knowledge of the plaintiff in error, used some of the bills ; that so soon as the plaintiff became aware of it, he prohibited it ; that about $200,000 remained, of the package in the bank, until deposited in court by the plaintiff, as a claimant upon this fund in controversy. This collateral security was rejected by the court, on the ground that the contract of indemnity, if sanctioned, would be a fraud on the bill-holders. A moment's reflection will correct such a fallacy.

It would be a fraud on the makers of the road not to pay them in some way, and the contract expressly provides that this collateral is to used only in the event that the bill-holders override their mortgage security. And whence comes the fund that the bill-holders claim an exclusive right to, and out of which the court below, and the bill-holders, deem it fraudulent in the plaintiff in error to claim an equal share with them ? It is a fund raised, the greater part of it, out of the sale of property created by our labor and materials, and to which neither the bill-holders, nor their debtor, the Monroe Railroad and Banking Company, had in equity any right, until we were paid. The objection amounts to this : that it is fraudulent in us to claim a participation with them in our own property.

We must think that it requires, in the bill-holders, much cool assurance, to come into a court of justice, a court of equity, and charge this honest arrangement to be a fraud upon them ! In *Moses* vs. *Mergatroid*, 1 *J. Ch. R.* 129, the chancellor declares it the duty of a court of equity to render such collateral pledges effectual. Instead of being a fraud, it is very likely, that without the arrangement that was made, the bill-holders would get nearly nothing ; for the road would not have been built, and its fragments would have been hardly worth selling. We repeat, that nearly all the fund in controversy is, as we believe, the production of the labor, skill, and money of the plaintiff in error and his associates, and for which he has never been paid ; and to charge him with fraud, because he seeks to be paid, is but adding insult to injury, and gainsaying the maxim that *is consecrated* in all Christian lands, that " the laborer is worthy of his hire."

A. H. CHAPPELL, for the defendant in error, made and insisted on the following points :

1st. That the bank-notes or bank-bills issued by the Monroe Railroad and Banking Company, in accordance with law, and as a circulating medium, are by force of the words " *shall be pledged and bound*," &c., in the first clause of the 11th section of the charter, (*Prin.* 372,) secured by a statutory lien or mortgage on the railroad, its property and equipments. The words " *shall be bound*," is the ordinary phrase used, in our Legislature, to express the lien of judgments and other statutory liens, as in the instance of the bond given by a tax-collector and his securities.—*Hotchkiss' Dig*.

And surely, the coupling of the word " *pledged*" with the word " *bound*," can have no other effect than to impart greater certainty and emphasis to the expression of the legislative intention.

2d. That the " *notes or bills issued by or from said company,*" and for the redemption of which the railroad and its equipments are pledged and bound, must be construed to mean such bank-notes or bank-bills, lawfully issued, as are contemplated and intended by the Legislature to become the circulating medium, the paper currency of the country.

The making of such issues is no longer, since the prohibitory statute of 1818, a business in which any individual, partnership, or corporation, can engage, without special legislative license ; whilst in regard to other branches of the banking business, such as buying and selling bills of exchange, drafts, checks, &c. ; discounting notes and bills, receiving money on deposit, &c. ; these are things against which there is no prohibitory statute or law, and which, consequently, may be done by individuals or companies, as of common right, and without first obtaining an act of the Legislature therefor. And as these things are permitted to everybody by the general law of the land, there is no reason why extraordinary security for debts incurred in this way by a bank, should be insisted on by the Legislature. But it is different in regard to the *bank-notes or bills proper.* These none can issue without special permission or charter ; and it is clearly the duty, as it has been the custom, of the Legislature to exact, in behalf of issues of this kind, extraordinary security from those to whom authority is given to make such issues. See *the personal liability* clauses, in the various bank charters, from that of the Darien Bank in 1818, down to those of the Georgia Railroad and Central Railroad Companies, in 1835. This policy of exacting, in favor of bank-bills or notes, the security of a personal liability of the stockholders therefor, commenced simultaneously with that other policy, which prohibited such issues as a free trade, and restricted it to those specially licensed thereto by the Legislature.

The highest considerations of public good come in aid of the argument founded on the foregoing view.

Of all the claims of bank debts, that which most challenges legislative care and fortification against the dangers of discredit and depreciation, is the one which forms the common currency, the circulating medium of the country. So sensible was the Legislature of this, that in 1836, in granting the present company's bank charter, it superadded, in favor of this description of debts, a lien on the railroad, to the personal liability of the stockholders.

3d. To sustain the claim of the plaintiff in error to take money out of the fund in court, under his mortgage of August, 1842, would be clearly destructive of this statutory lien and priority of bill-holders, and is therefore inadmissible.

But, aside from all other reasons, the plaintiff precluded himself from any right of participation in this fund, by the notice which he gave (on the day of the sale) of his mortgage, and of his determination to pursue the road under it.

4th. To permit the plaintiff in error to take, as bill-holder, under the alleged deposit of bills as a collateral security for his mortgage-claims, would be enabling the company, after its insolvency, to put inferior debts on the same footing with bills, by simply giving such bills as a security, which would be a fraud on previously existing bill-holders, and tend to the entire defeat of their statutory lien.

5th. The distinctions as between equitable assets and legal assets are wholly inapplicable in the present case, because the provisions of the statute would be equally obligatory and controlling over the court, whether the assets were of the one or the other sort. But if the law of these distinctions could be applied here, it would be found to be clearly in favor of the position maintained by the defendants in error.—1 *Story Eq.* 553. In reference to the question of consideration, see *Cooper's Bankrupt Law*, 261-5, by which it is clear that the consideration which passed to the company, and for which the note or bill was originally issued, is a proper subject of inquiry, and not the consideration that passed between that person, or any second holder, and the purchaser from him.

WASHINGTON POE, for defendant in error, also addressed the court.

WILLIAM LAW, for the plaintiff in error, in conclusion.

We contend, in the first place, that the 11th section of the charter of the Monroe Railroad and Banking Company, ought not to be construed as creating a *lien* on the property of the corporation, because,

1st. Secret liens created by statute operating in restraint of a free alienation of property, are against the policy of the laws of the country ; and such construction will only be given when the words are too strong to bear any other.—*Black* vs. *Scott*, 2 *Brock. Rep.* 330, 346.

The court may accomplish the legitimate purpose of the Legislature, by securing to the bill-holders of the corporation a priority of payment out of the entire fund or property of the corporation in their hands, unsold or unencumbered by any *perfected lien* at the time of its failure to redeem.—*Conard* vs. *At. In. Com.* 1 *Peters*, 386.

2d. A contrary construction would fetter and tie up the property of the company to an extent which would *disable* them to accomplish the purposes of their creation, and prevent the sale of any of their property ; whilst in the charter the Legislature recognize their right to sell, farm out, &c.—*Prince*, 314, sec. 1; *ib.* 369 sec. 1. The necessity of contracts for work on the road, and consequently of securities, by the company, was so apparent to the Legislature, that in the 8th section of the charter, they except such contracts from the formalities prescribed as necessary to the validity of its contracts in all other cases.

3d. It is a general principle, that the stock and other property of private corporations is deemed a *trust* fund for the payment of the debts of the corporation ; so that the creditors are deemed to have a lien, or right of priority of payment, &c. But as this corporation was created with a double aspect, to wit, banking and the construction of a road ; and as a moiety of its capital was appropriated to each purpose, it became necessary to incorporate the 11th section in the charter, in order to subject the road-half to liability for the redemption of the bills.

The purpose was to put the whole capital and property on the same footing of liability for the redemption of the bills.

But it never has been supposed that the lien or priority of payment of creditors upon the trust fund, would follow and attach upon it in the hands of a *bona fide* purchaser for valuable consideration.—2 *Story's Eq. Juris.* 1252. The effect, therefore, of the 11th section, was to make

Collins *vs.* The Central Bank et al.

the road, and other property attached to it, equally with, and to the same extent as, the other moiety of its capital, a *trust* fund for the redemption of the bills ; and to no greater extent.

It would be most singular that the Legislature should give a *lien* on one half of the capital, and leave the other half to the operation of the ordinary principal of a trust fund ; and if the moiety was a *trust* fund for the creditors of the bank, the other moiety was likewise a *trust* fund for the creditors of the road ; hence the necessity of the 11th section.

We contend, in the second place, that giving to this section the utmost latitude of construction for which our adversaries may contend, in its operation as a *lien*, still we say, that as the road was built by the labor, the money and the materials of the contractors, there never was anything in the corporation upon which that lien could attach, save the franchise, and the equity of redemption. The material structure was never vested in them, but subject to a condition fixed by contract, before the work was done or commenced. If they acquired any interest or title, it was so instantaneously out of them that no lien could attach.

Illustrate the argument by the case of dower. It is more than a lien ; it is an interest in the thing, created, too, by law. Purchase and simultaneous mortgage by husband, no dower in wife, but subject to the mortgage.—3 *Paige*, 513, 515 ; 2 *Bland.* 242.

Purchase by husband, without mortgage, equitable lien of vendor supersedes dower. See same cases. Take the more analogous case of land purchased for the road, and equitable lien of vendor for unpaid purchase-money ;—could this lien displace it ?

What is the reason of this equity ? A person who has gotten the estate of another, ought not to keep it, and not pay the full consideration money.—2 *Story's Eq. Juris.* sec. 12, 19, 20 ; 15 *Ves.* 340.

The statute gives a lien to mechanics, but that lien will not supersede the equitable lien of vendor, for purchase-money.—*Gillespie* vs. *Bradford*, 7 *Yerger*, 168 ; cited 2 *Wheeler's Dig.* title " lien." Nor will it supersede the lien of a mortgage given to secure a sum of money from a third party, at the same time the title was delivered, part of which money, so borrowed, was applied to the payment of purchase-money ; the purchaser having paid part of purchase-money, and taken a bond for titles, before the mechanic was employed.—14 *Pick. Rep.* 49.

Now, it is conceded that the doctrine of equitable lien for purchase-money is limited to real estate. But it is equally true that a court of equity will find no difficulty in raising a like lien in the sale or transfer of personal property, when that is matter of agreement or contract.—2 *Story's Eq. Juris.* sec. 1231 ; 1 *Ves. Junr.* 478 ; 1 *Turn. and Russ.* 469, 475–6 ; 15 *Ves.* 340, 347, 349.

An agreement for a mortgage will create an equitable lien for the purchase-money of a slave sold.—1 *Bailey's Eq. Rep.* 223.

In these cases, the equity of the seller is higher and prior to any person claiming as a volunteer under the purchaser, or even of a purchaser for valuable consideration, with notice.

In this case, the equity of the contractors to be paid for their work and materials furnished, is better and prior to the bill-holders, who claim under and through their debtor, and can have no greater right to our property, without paying for it, than the debtor had. But we have super-

added to that equity a legal title. We took a mortgage :—can the lien of the bill-holders be permitted, in a court of equity, to overreach that mortgage thus sustained by a better and prior equity ?

The rule is, that where the equities are unequal, the preference is constantly given to the superior equity.—1 *Story's Eq. Juris.* 64 *d.*

A *bona fide* purchaser will be protected, but not if he be a judgment creditor purchasing in the property of his debtor ; because, in that case, as he pays no new consideration, he can have no rights but what his debtor had.—1 *Story's Eq. Juris.* 411 note ; *Burgh* vs. *Burgh, Rep. Temp. Finch,* 28. In this case he must give way to superior and prior equity, and *a fortiori* to a legal title founded on a prior equity.

It is upon the same principle that the English doctrine of tacking rests, (a doctrine interfered with in America by our registry acts.) A third mortgage, buying in a prior judgment, may tack ; whilst a judgment creditor, buying in a prior mortgage, may not. The reason is, that in the former case he lent his money upon the faith of the land, and has therefore a higher equity ; in the latter, he was a general creditor.—1 *Story Eq. Juris.* 416. And thus it is that a specific lien is always more favored in equity than a general.—1 *P. Wms.* 278 ; 2 *Ves. Sen.* 262-3.

What, then, shall hinder the court from protecting these mortgages ? It is replied, the statute ; but it is a principle that no statute shall exclude all equity.—2 *Roll. Rep.* 500 ; 2 *Vern.* 236, 750 ; 1 *Ves. Sr.* 66.

But it is said the bill-holders took the bills upon the faith of the statutory lien, and their equity is also very high, and prior to ours.

It is very high ; but neither higher nor prior, nor as much so as ours, if the preceding argument be true ; because, before theirs attached, before there was anything in the debtor upon which it could attach—nay, before we parted with our materials and bestowed our labor we took our security.

But again : it was our work, labor, money and materials which conferred its value on the road. And the principle is, in the case of improvements, repairs, &c., where the party making them has acted *bona fide* and *innocently,* and a substantial benefit has been conferred on the owner, equity will give a lien for such improvements.—2 *Story,* sec. 1236, 1237, 1239, sec. 5 ; *Dana,* 578, cited 2 *Wheeler's Dig.* 118, sec. 10. The maxim is, *jure naturæ equum est, neminem cum alterius detrimento et injuria fieri lucupletiorem.* If this principle is true in its application to the owner, does it apply with less force to the creditors, who take only what he had ? Receiving the benefit of these improvements, they are bound equally with the owner to pay for them. This is the highest equity and the highest morality.

If the owner would be bound, *ex æquo et bono,* to pay for such improvements, all taking the benefit under him as volunteers, are equally bound. Creditors are not strictly volunteers, but they are *quasi* such upon such a question as this ; they are not purchasers for valuable consideration paid at the time.—See 1 *Story,* sec. 411, *note,* already referred to, as to a judgment creditor purchaser. So in the case of voluntary conveyances, in payment of a debt, although they can scarcely be called voluntary.—1 *Story,* sec. 433. Yet as no new consideration is paid, they are in a sense volunteers, and so considered in the comparison with *bona fide* purchasers for a valuable present consideration.

I now take the broad ground of a more comprehensive equity, and insist that a court of chancery will remove, displace or supersede a *general lien*, whether created by statute or not, to protect the rights of those who are entitled to a prior equitable interest in the thing. In support of this principle, we rely on the following authorities, viz.: 1 *Paige*, 128–9; 2 *Paige*, 266–7; 3 *Des. Rep.* 74; 2 *Sergt. & Rawle*, 11; 2 *Walsh. C. C. Rep.* 69; 3 *Binn.* 347, *note*; 1 *Eq. Cas. Abridg.* 320; 1 *Pr. Wms.* 282; 3 *Ves. Jun.* 576; *Sug. Vend.* 336.

And now there is another view in which I desire to present this case, which I think will give an additional force and weight to the foregoing principle.

Generally, when the Legislature creates a lien by statute, they also prescribe the mode by which it can be enforced at law. In this case they have omitted to do so. The question then occurs, how can the bill-holders enforce their lien at law? The only conceivable mode would be, by maturing their claims into judgments, and by a levy and sale of the road.

But it has been decided, that the public have an interest in railroads, that they are public roads or improvements, when constructed under acts of the Legislature, notwithstanding the tolls they produce are appropriated to the persons by whose capital and enterprise they have been constructed. In the construction of such roads, the public are considered as acting through the agency of individuals.—*Lex. & Ohio R. R. vs. Applegate*, 8 *Dana*, 295; 4 *Barbour & Har. Dig.* 556.

Now, in that view of the subject, can it be supposed, that each bill-holder, getting judgment, might proceed to sell any part of this road in fractions, at different sales, in the different counties through which it passes, to different purchasers, and thus entirely defeat the rights and interests of the public, and the objects and intentions of the Legislature in granting the charter? Such a construction of the legislative act would be suicidal of the work they had chartered. And again, as no preference is created as among the different bill-holders, would one man, by getting a judgment, and forcing a ruinous sale, be permitted to defeat the rights and interests of all the other bill-holders? And would those who had judgments be permitted to take the whole fund in preference to other bill-holders without judgments? And yet a court of law, in the distribution of the fund, could only regard the legal priorities.

These numerous difficulties show that this lien can only be enforced in equity; and the action of the Superior Court, in assuming the jurisdiction in this case in chancery, could alone be predicated on the position we assume.

These bill-holders have then only an equitable lien; and being compelled to go into equity, the fund they bring there is equitable assets, entirely under the control and rules of the chancery in its distribution, so far as their claim is concerned.

What are equitable, and what are legal assets? See 2 *Smith's Chan. Pr.* 273–274. There is abundant room, then, for the court to look to and consult the real equities of the parties.

The learned judge in the court below felt the equities of the complainants in error, and said if he had controlled the case in the first instance, he would have protected them by a sale of the road, which they constructed by itself, apart from the other portion. That concession yielded every-

thing : for the fund was still in his hands, and the equity of the plaintiffs in error fastened upon the conscience of the court of chancery, and bound it to relieve through that fund.

If exact justice could not be done, he should have approached it as nearly as possible.

3d. I proceed to consider, in the third place, whether the plaintiffs in error are not entitled as bill-holders ?  The contract for additional collateral security was made on the same day with the mortgage.  It is true, the packages were not delivered, nor the schedule taken, until January, 1845 ; but no maxim is better understood in equity, than that it looks upon what is agreed to be done, as done ; and when the act is done, it has relation back to he time of the contract.—1 *Story Eq.* sec. 64, *g* ; 3 *Wheat.* 563, 577.

The company had no right to touch these bills after the contract ; and in the events provided for by it, the plaintiffs in error had an absolute right to take possession and use them.  The bailee, or trustee, in this case, having received the schedule of the packages, and left them for safe keeping as a special deposit in the bank, was an acceptance in law by him of the trust, which authorized an action at law by the plaintiffs in error against him for these bills.—2 *Story's Eq.* sec. 1041.  And although some doubt has been expressed as to the action at law, it is certain a remedy would exist in equity.—*idem, and Com. Dig. Chancery,* 4 *w* 4 ; *id.* 2 *a.* 1 ; *Scott* vs. *Parker,* 3 *Mur. Rep.* 658–9.

If this contract was legally consummated, and the bills pledged for the security of the debt, so as to entitle the pledgee to hold and use such bills for his indemnity in case the debt is not paid, such bills are to be considered issued and in circulation.—9 *Paige,* 14.

We have endeavored to prove by the contract and acts of the company and trustee, the former part of the foregoing proposition ; the latter part is the conclusion of law, which the authority establishes.

We contend, upon the following authorities, that the bill-holders should be paid in proportion to the consideration actually paid by them for their bills.—2 *Smith's Chan. Pr.* 265 ; 15 *Mass. Rep.;* 4 *Paige Rep.*

*By the Court*—WARNER, Judge.[*]

This case comes before the court on a bill of exceptions and writ of error to the decision of the Superior Court for the county of Bibb, distributing the proceeds of the sale of the property of the Monroe Railroad and Banking Company.  It appears, from the record in the cause, a bill was filed on the chancery side of said court, at the instance of the company, to have the road and its appurtenances sold for the benefit of its creditors, and at May Term, 1845, a decree was made by the court, ordering a sale of the road, from Macon to its terminus in the county of De Kalb.  This decree declares, that the creditors of said company, " if any controversy should arise respecting their claims, should litigate

---

[*] LUMPKIN, Judge, being a bill-holder of the Monroe Railroad and Banking Company, gave no opinion in this case.  After the judgment of the court was delivered, the same being adverse to his interest, Judge L. gave it his public approbation ; desiring and designing to share with the court the responsibility attaching to the opinion delivered.

among themselves, in respect to all objections which would, or might have been, available against them by said company, if said sale had not been made in relation to matters of set-off, and whether they be subject to objections on account of the statute of limitations, non-performance of contracts, or other cause ; *embracing the quantum of consideration paid for the claims, or any of them*, and also, that the *liens* claimed by the respective creditors, be then and there also investigated and adjudicated."

In pursuance of this decree, the court, at its May Term, 1846, proceeded to distribute the fund, arising from the sale of the property, among the several claimants, one of whom was Collins, the plaintiff in error, and his co-contractors, who excepted to the decision of the court below.

First—"Because the court ruled and decided that the clause in the charter of said Monroe Railroad and Banking Company, declaring that said road should be pledged and bound for the redemption of the bills or notes of said company, created a specific and paramount legal lien on said road over all other liens."

. In the year 1833, the Legislature granted a charter to the Monroe Railroad Company, to construct a railroad from Macon to Forsyth. In the year 1835, another act was passed amending and reviving the act of 1833 ; and, in the year 1836, another act was passed, amending and extending the provisions of the original charter, and conferring upon the company banking privileges. By the 22d and 23d sections of the last-mentioned act, the charter of the Monroe Railroad Company is declared to be continued in force, in all matters in which it does not conflict with the provisions of the latter act ; the two acts, therefore, when not in conflict, will be considered as one act, and construed accordingly.

By the 11th section of the amended charter it is declared : "The railroad to be built *by said company*, from Macon to Forsyth, together with all the revenue arising therefrom, and all the property, equipments and effects therewith connected, shall be *pledged and bound* for the redemption of the notes or bills, issued by or from said company, and for the redemption of the same."—*Prin. Dig*. 372. The words "*pledged and bound*," used in this section of the charter, taken in their common acceptation, or in their legal signification, leave no doubt upon our minds as to the *intention* of the Legislature. The road to be built by *the company*, and all the rights of the company connected therewith, which would, in law, be subject to the payment of the debts of the company, were intended to be pledged and bound for the redemption of the notes or bills issued by the company ; and in our judgment, so much of the proceeds of the sale of said road, built *by said company*, and equipments and materials furnished *by them*, ought first to be applied to the claims of the billholders. That the bill-holders, under that section of the charter, acquired all the rights which belonged to the company, but no other, and to that extent only, we are of the opinion the decision of the court below was correct.

This brings us to the consideration of the 2d, 3d and 4th grounds of exception taken to the decision of the court below, which are all mainly included in the 4th exception, which is : "Because the court ruled and decided that the work and labor done on said road, and materials and iron furnished and put on said road by the contractors, to whom said mortgages were given, which said work was done, and materials fur-

nished, after the *insolvency* of said Railroad and Banking Company, was liable and subject to the payment of the bills of said company, in preference to said mortgages or debt, for said work and materials."

The whole road, together with all the equipments, was sold, and the proceeds of the sale are now in the hands of a court of equity for distribution: the question is, whether the contractors, who <u>done</u> work and furnished materials on the road above Griffin, after the *insolvency* of the company, ought to have been postponed, to the bill-holders, to the extent of the *relative value* of such work and materials, to the whole fund in hand. The paramount object of the Legislature, in granting the charter to the company, was, to advance the public interest by the construction of the road. The *completion of the road* was the inducement for the grant ; the banking privilege was conferred on the company as a *means* to enable them to carry out this great work of internal improvement, for the benefit of the public.

The record, however, informs us, that before the completion of the road, the company became *insolvent*, whereby they were wholly unable to go on and finish the work, and the objects of the Legislature were about to be frustrated. During this state of things, the plaintiff in error and his co-contractors enter into a contract with the company to complete the road, from Griffin to the terminus in De Kalb, furnish iron, equipments, and all necessary materials. This contract was entered into on the 2d day of August, 1842, and by one clause thereof, it was stipulated, "that the whole of the Monroe Railroad, from Macon to the point of junction with the Western and Atlantic Railroad, and all and every part thereof, and all of the appurtenances, engines, tenders, cars, shops, tools, implements of every kind connected, *or to be connected*, and all real estate to the same appertaining, and all other effects to the same appertaining, shall be, and is, hereby conveyed and vested in the said parties of the second part, *in full title and estate, until all the dues and payments, to which they shall become entitled under this contract, shall have been fully met and satisfied.*"

By the 11th section of the original charter, (*Prince Dig.* 317,) the company have the right, " when they see fit, to rent, or farm out, any part, or the whole of their said exclusive right of transportation on said railroad, with the *privileges thereof*, to any individual or individuals, or other company, subject to the rates above mentioned." The company, under this clause in the charter, would not have had the right to have rented or farmed out their privileges, granted by the Legislature, so as to have *defeated* the object and intention thereof ; but the farming it out to the plaintiff in error and his co-contractors, for the purpose of constructing and completing the road, was, in our judgment, legitimately carrying out the views and intentions of the Legislature, in granting the charter to the company.

The company, in consequence of their *insolvency*, were unable to complete the road, and it is, together with the privileges thereof, farmed out, or let, to the plaintiff in error and his associates, for the purpose of having the same completed to the terminus of the State road in De Kalb ; the contractors having *the full title and estate therein, until all the dues, and payments, to which they shall become entitled, under their said contract,* shall have been fully met and satisfied. In pursuance of this contract, the plaintiff in error, and his associates, expended large sums, in and

about completing said road, from Griffin to the terminus of the State road in De Kalb ; furnished several tons of railroad iron and other materials ; done several miles of grading ; furnished timber, and built several miles of superstructure ;—all of which was sold, with the road, and contributed to swell the fund, now in the hands of the court for distribution ; but, under the decision of the court below, were denied any participation whatever in the distribution thereof, notwithstanding their work and labor, materials and equipments furnished by them, were sold under the decree of the court, and thereby contributed directly to increase said fund ; the court below being of the opinion, the bill-holders had a prior lien thereon, to the contractors who done the work on the road, furnished iron, materials and equipments, as before stated, from Griffin to the terminus of the State road in De Kalb.

We have already shown, the bill-holders had a prior lien, under the 11th section of the amended charter, to the proceeds of the sale of so much of the road as was *built by the company*, materials and equipments furnished *by them ;* nor could the company, by contract made in 1842 with the plaintiff in error and his associates, defeat such lien, because the lien of the bill-holders was of prior date to the contract, on so much of the road as was built, materials and equipments furnished *by the company ;* that portion of the road, however, built by the plaintiff in error and his associates—the materials and equipments furnished by them, on that part of the road above Griffin, to the terminus of the State road—*was not built by the Monroe Railroad and Banking Company ;* nor were the materials and equipments furnished by the plaintiff in error on that portion of said road, furnished by " the company ;" nor was the company entitled to the same, until payment was made therefor, according to the stipulations of the contract, made on the 2d August, 1842.   Although it was not competent for the company to make a contract, in 1842, to defeat the lien given by statute to the bill-holders, on that part of the road built *by the company, up to the time of its insolvency ;* yet it was competent for the company to carry out the intention of the Legislature, in the completion of the road, by making a contract which would give the undertakers a lien on such portions of the road as such undertakers should thereafter build, *until they were paid therefor.* It was competent for the company to stipulate, by *express agreement,* the contractors should have a *lien* on that part of the road which they contracted to build, to the extent of the work done, and materials furnished, until payment was made by the company for such work and materials.—*Kirkman* vs. *Shawcross,* 6 *Term. Rep.* 14 ; *Green* vs. *Farmer,* 4 *Burrow Rep.* 2220 ; 1 *Story's Eq.* 483, sect. 506.   In *Green* vs. *Farmer,* Lord Mansfield says : " The convenience of commerce and *natural justice,* are on the side of liens, and, therefore, of late years, courts lean that way.   1st.  Where there is an *express contract ;*  2dly.  Where it is *implied* from the usage of trade ;  or 3dly. From the manner of dealing between the parties in the particular case."

This contract, made on the 2d of August, 1842, between the company and the plaintiffs in error, giving the latter a lien on that part of the road they should build, until paid for the same, and materials furnished, does not at all conflict with the lien created by the statute on that part of the road built by the company ; nor would the company have been entitled to that portion of the road, built by the contractors above

Griffin, until payment made to them therefor. Certainly, the bill-holders, who are the creditors of the company, cannot be considered as standing, at least in a court of equity, in a better condition than the company under whom they claim. If the company could not appropriate the road, built by the contractors, to their own use and benefit, until payment for the work and materials, on what principle is it the bill-holders, claiming under and through the company, can justly claim, in a court of equity, to have exclusively appropriated to their benefit, the proceeds of the sale of such portion of the road and materials?

We cannot bring our minds to the conclusion, the Legislature intended to create a lien on any portion of the road, materials, or equipments, in favor of the bill-holders, that was not built, or furnished, *by the company.* It was not intended to violate that principle of *natural justice* which exists in favor of those whose labor constructed the road, and who furnished materials and equipments therefor, after the *insolvency* of the company, under an *express agreement,* that those who should perform such labor, and furnish such materials, should have vested in them the full title and estate thereto, until all the dues and payments to which they should become entitled, under such agreement, be fully met and satisfied. This agreement, too, was calculated to carry into effect the leading object of the Legislature, in completing the road, when the company, to whom the charter was granted, by its hopeless insolvency, forbid the accomplishment of the just expectations of the public in that regard. Nor did the bill-holders take the bills on the *faith* or *credit* of that portion of the road built, or materials furnished by the plaintiff in error, or his associates, under the agreement of 2d August, 1842; for the record shows the company was *wholly insolvent* at the time, and if the road had been then sold, the fund would not have been increased, by the labor and materials furnished thereon by the plaintiff in error; but, on the contrary, would have been diminished to that extent.

The effect of the decision of the court below is, to place the bill-holders, with respect to the road above Griffin, built by the plaintiff in error, in a better condition than the company under whom they claim; for the company could not, under the agreement, be considered the *owners* of that portion of the road, materials and equipments, built and furnished by the plaintiffs in error, until they had *paid for the same.* On what principle of equity, or of morals, is it, then, that the bill-holders, who claim under or through the company, can appropriate to themselves the proceeds of such portion of the road and materials, without first paying the plaintiff therefor? Will it be answered, The statutory lien, under the 11th section of the charter, confers the right? That section only gives the bill-holders a lien on so much of the road, materials, equipments, &c., as *shall be built and furnished by the company;* and, we have already shown, that portion of the road above Griffin, built by the plaintiffs in error, and the materials and equipments furnished thereon by them, was *not built by the company,* nor were the materials or equipments furnished *by the company,* nor did that portion of the road, materials, or equipments, belong to the company, until payment was made therefor, in pursuance of the agreement, which is not pretended to have been done.

Inasmuch, therefore, as that portion of the road above Griffin, which was built by the work and labor of the plaintiffs in error, as well as the

materials and equipments furnished by them, has been sold, together with the whole road, and the proceeds thereof thereby constituting a relative proportion of the whole fund, now in the hands of the court for distribution, we are of the opinion the court below committed error, in excluding the plaintiff in error and his associates from receiving a relative proportion of said fund; that the plaintiff in error and his associates, in our judgment, have a prior and superior equity to the bill-holders, to be paid out of said fund, to the extent, and in proportion to the *relative value*, of the work done by them on said road, materials and equipments furnished by them, between Griffin and the terminus of the road, in the county of De Kalb, to be apportioned in the manner hereinafter stated, in the judgment of this court.

The 5th exception to the decision of the court below is : " Because the court ruled, and decided, that the bank-bills should each take in proportion to the value received by the bank for it, at its emission by the bank, whereas the original decree fixes the quantum of consideration paid for the bills by the claimants, as the amount to be received."

The original decree, ordering the road to be sold, further directs : " that the creditors of the company, if any controversy should arise respecting their claims, should then litigate among themselves, in respect to all objections, which would, or might, have been available against them by said company, if said sale had not been made, in relation to matters of set-off; and, whether they be subject to objection on account of the statute of limitation, non-performance of contract, or other cause, *embracing the quantum of consideration paid for the claims, or any of them ;* and, also, that the liens claimed by the respective creditors be then and there investigated and adjudicated."

It was urged at the bar, the court should adopt the rule in cases of bankruptcy for its government; in this case, that notwithstanding a party purchases a bill, or note, for less than its nominal value, yet, in the distribution of the bankrupt's effects, he is entitled to receive the full amount thereof; and *Cooper's Bankrupt Law*, 261-5, was cited. Whatever may be the rule in cases of bankruptcy, we think this case stands on a very different footing. Here is a fund, raised under a decree made by a court of chancery; and a distribution of that fund is being made, in accordance with the terms of that decree. The court having the jurisdiction and authority to direct a sale of the property, and thereby create the fund, has also the same power and authority, to direct the *manner* in which such fund shall be distributed.

One of the grounds of application to the court for a sale of the road was, that the company was *insolvent*, and unable to pay its debts. With the intent to measure out justice to the respective claimants as far as practicable, knowing there would not be sufficient to pay all, the court declares the claimants on the fund shall litigate among themselves, and that the liens of the respective creditors should be investigated and adjudicated by the court, " embracing the quantum of consideration *paid for the claims, or any of them.*" It is under the authority of the decree, made for the sale of the road, the court proceeds to investigate and adjudicate the *liens,* claimed by the respective creditors on said fund.

Why shall not the court also embrace, in its investigation and adjudication, the " *quantum of consideration paid for the claims, or any of them,*"

as directed by the decree ? Is one portion of the decree more binding on the court, in making a distribution of the fund, than another ; and if so, on what principle is it made more binding ?

Independent of the decree itself, we are of the opinion, the clear equity of the case is in favor of distributing the fund among the respective bill-holders, in proportion to the *quantum of consideration* paid for the bills by the respective holders thereof. Although the funds in the hands of the court cannot, perhaps, be *technically* considered as equitable *assets*, yet, being raised under the decree of a court of equity, and under its control, a proper regard should be had to the fundamental principles of equity in making a distribution of it. If the fund was sufficient to pay all the claimants, there would be no difficulty ; but there are many who must go unpaid. Shall the bill-holder, then, who paid but ten cents in the dollar for his bills, exhaust the whole fund, or a majority of it, by receiving the full amount of his claims : that is to say, receive one hundred cents out of the fund for which he paid only ten ; while he who paid one hundred cents in the dollar for his claims gets no more. In other words, has he who paid but ten cents in the dollar for his bills, the same equitable claim on the fund as he who paid one hundred cents in the dollar, when the fund is not sufficient to pay all ? In *Davison* vs. *Watson*, the plaintiff, a bond creditor of the testator, compounded with the other creditors, and they executed an assignment to him of their debts. On the hearing, the usual decree was made : " The legatees obtained an order on petition, that the minutes of the decree should be added to, by directing an inquiry, whether the said plaintiff had purchased from, or compounded with, any of the creditors of the testator for their debts, and what *consideration was really paid, or given, for such debts;* and a declaration, that what the master should find to have been *actually advanced, paid or allowed by the said plaintiff for such debts, and no more,* was to be allowed to him in respect thereof."—2 *Smith Chan. Prac.* 265.

In making an equitable distribution of the fund, therefore, under the original decree, amongst the bill-holders, we are of the opinion, the *quantum of consideration* paid therefor by the respective claimants, at the time they become the holders of said bills, should constitute the value of their claim on the fund ; and not the value received by the bank for such bills, at the time of the emission of the same.

The sixth and last exception is : " Because the court erred in deciding that the said bills set apart as collateral security, to secure the work, labor and materials found and furnished, on said road, had not been legally issued by said bank, and therefore could not claim any of said fund." On looking into the manner in which this security was taken by the plaintiff in error and his associates, as disclosed by the record, we are decidedly of the opinion they are not entitled to receive any portion of said fund as *bill-holders.* The bills were not issued, as was contemplated by the charter of the company, and the manner in which they are now attempted to be used for the purpose of placing the holders thereof on the same footing as the holders of bills, issued and put in circulation as money, according to the terms of the charter, cannot receive the sanction of this court : to permit it would be, in our judgment, to sanction a fraud on the rights of those bill-holders, whose bills were legitimately issued, and put in circulation as money, according to the terms and provisions of

the charter. On this ground of exception taken, we most cheerfully concur in opinion with the court below.

This cause came on to be heard on the transcript of the record from the Superior Court of the county of Bibb, and was argued by counsel: Whereupon it is considered and adjudged by the court, that the judgment of the court below be reversed, on the following grounds: First, Because it is the opinion of this court, that the bill-holders had a paramount lien only on the fund, raised by the sale of the railroad from Macon to Griffin, and so much only of the road from Griffin to the terminus in De Kalb, as was built by the Monroe Railroad and Banking Company, prior to the 2d day of August, 1842 ; and that the contractors of the second part, under the agreement of the 2d of August, 1842, in the record mentioned, had a prior and superior equity to the bill-holders, to be paid out of said fund, in proportion to the *relative* value of the work done by them on said road, and materials and equipments furnished, between Griffin and the terminus of the road, in the county of De Kalb ; and that the court below committed error, in excluding said contractors from any participation in said fund, to the extent of the *relative value* of their claim for work and labor done, and materials and equipments furnished said road, between the city of Griffin and the terminus of the road in De Kalb as aforesaid.

It is further the judgment of this court, that the *relative value* of the work and labor done, and materials and equipments furnished said road, by said contractors, between the places last aforesaid, be apportioned by three commissioners, to be appointed by the court below, with power to hear evidence in relation thereto ; and make report thereon, within such time as to the said court, shall be deemed expedient.

Second, Because the court below committed error in deciding, " that the bank-bills should take, each in proportion to the value received by the bank for it, at the time of its emission by the bank." It being the opinion of this court, that each bank-bill should take in proportion to the *quantum of consideration paid therefor* by the holder, or claimant on the fund ; and that such holder, or claimant, should state the quantum of consideration actually paid therefor, on oath in writing, with the right of other contesting claimants for said fund, to traverse the same.